419 F.2d 936
 CHICAGO AND WESTERN INDIANA RAILROAD COMPANY, Plaintiff-Appellee,
v.
The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY,
Defendant-Appellant.
CHICAGO AND WESTERN INDIANA RAILROAD COMPANY, Plaintiff-Appellant,
v.
The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Defendant-Appellee.
 Nos. 17376, 17377.
 United States Court of Appeals Seventh Circuit.
 Dec. 29, 1969.
 
 John H. Park, Chicago, Ill., for Chicago & Western Indiana RR Co.
 Floyd J. Stuppi, John P. Frestel, Jr., John J. Schmidt, Leon S. Conlon, Chicago, Ill., for Atchison, Topeka & Santa Fe RW Co.
 Before MAJOR, Senior Circuit Judge, and KILEY and FAIRCHILD, Circuit judges.
 MAJOR, Senior Circuit Judge.
 
 
 1
 These appeals, No. 17376 by The Atchison, Topeka and Santa Fe Railway Company (hereinafter called Santa Fe or the lessee), and No. 17377 by Chicago and Western Indiana Railroad Company (hereinafter called Western Indiana or the lessor), are concerned with the same general subject matter and have been consolidated here for review. The cases were heard and decided by District Judge James B. Parsons on the pleadings, with certain affidavits and exhibits attached thereto. In the beginning we set forth a brief statement of the facts, with the various claims as shown by the pleadings, the issues arising therefrom and the rulings of the district court thereon.
 
 
 2
 The rights and obligations of the parties are dependent upon the covenants contained in a 999-year lease entered into May 21, 1887, between Western Indiana as lessor and the predecessors of Santa Fe, to the rights and obligations of which Santa Fe has succeeded. By the terms of the lease Santa Fe acquired the privilege, in common with other railroads, of using certain described tracks and other facilities of Western Indiana in the operation of its trains in and out of Dearborn Street Station, Chicago, Illinois.
 
 
 3
 On September 1, 1963, Pete Sherrard, an employee of Western Indiana, was working as a switchtender at the 12th Street tower in the railroad yard. His duties involved the operation of manual switches under the direction of the supervisory personnel of Western Indiana. Western Indiana admitted that while Santa Fe train No. 19, 'The Chief,' was departing from the Dearborn Street Station, Sherrard negligently and carelessly threw the operating lever on a crossover switch over which the rear portion of the train was passing. The last two cars were derailed but remained connected with the train. The derailed cars were dragged southward until they collided with the switch tower, demolishing it and substantially destroying the interlocker system. Following the accident, Western Indiana removed the wreckage and made temporary provision for the movement of trains entering and departing from the station. Thereafter, it constructed a new switch tower and completely replaced the interlocker system.
 
 
 4
 On January 15, 1965, Western Indiana by its complaint sought to recover from Santa Fe the entire cost of such replacement under lessee's Covenant 6 of the lease or, in the alternative, to require Santa Fe to pay its engine and car mileage proportion of said expenditure in accordance with lessee's Covenant 5. (It is agreed that under this covenant Santa Fe would be required to pay 46.01% Of the expenditure.) The parties agreed that Covenant 5 of the lease applied to the expenditure of $33,225.06 for clearing the wreckage and for temporary facilities permitting operation. Consequently, Santa Fe agreed to and, in accordance with Covenant 5, paid its user proportion (46.01%) of that cost, or $15,316.75.
 
 
 5
 Santa Fe by its answer denied liability under either Covenant 5 or Covenant 6, but admitted liability under Covenant 14.
 
 
 6
 The district court held that Covenant 6 was not applicable.[1] Western Indiana acquiesces in this ruling. The court also held that Covenant 5 was not applicable but that Santa Fe's liability was controlled by Covenant 14, which required it to pay one-sixth (16.67%) of the expenditure made by Western Indiana on account of 'improvements or betterments.' On that basis judgment was entered in favor of Western Indiana in the amount of $35,691.39.
 
 
 7
 Western Indiana appeals from this judgment in its favor on the premise that the court erred in calculating Santa Fe's liability on the formula provided in Covenant 14 rather than that in Covenant 5.
 
 
 8
 On February 9, 1965, Santa Fe, in connection with its answer to Western Indiana's complaint, filed a counterclaim consisting of two counts. In Count 1, it alleged that the derailment was proximately caused by the negligence of Western Indiana, and recovery was sought from it for money expended and to be expended in clearing the wreckage, repairing its cars and operating other scheduled passenger trains over the property of Western Indiana during the course of making repairs. In Count 2, recovery was sought for money expended and to be expended in discharge of liability to passengers and employees resulting from the negligent conduct of Western Indiana.
 
 
 9
 On May 17, 1966, Western Indiana filed a supplement to its complaint in which it alleged that Leo V. Harrison, a member of Santa Fe's train crew, obtained a judgment against it for damages sustained as a result of the train derailment. A portion of the judgment was satisfied by Western Indiana's insurer, and reimbursement was sought against Santa Fe for the balance in the amount of $75,000.
 
 
 10
 The district court held that by the terms of Covenant 6 of the lease the admitted negligence of Western Indiana was imputed to Santa Fe. Based on this conclusion the court held that Western Indiana was entitled to recover from Santa Fe the $75,000 which it paid to settle the personal injury judgment of Leo V. Harrison. Further, and for the same reason, it denied Santa Fe's right to recover on the claims asserted in its counterclaim. Accordingly, judgment was entered in favor of Western Indiana in the amount of $75,000 on its supplemental complaint, and also in its favor on Santa Fe's counterclaim. From this judgment Santa Fe appeals (No. 17376).
 
 
 11
 As already noted, in No. 17377 Western Indiana relied primarily upon Covenant 6 as a basis for the recovery sought or, in the alternative, upon Covenant 5. In response to Santa Fe's motion for partial summary judgment, the district court held that neither 5 nor 6 was applicable but that Santa Fe's liability was determined by Covenant 14. Inasmuch as Western Indiana raises no question here as to the correctness of that ruling as it pertains to Covenant 6, we need not be concerned with that covenant on this facet of the case.
 
 Covenant 5 in pertinent part provides:
 
 12
 'Santa Fe shall pay to Western Indiana its proportion of the expenses 'incurred or paid by the lessor in maintaining its organization, in maintaining and keeping in the thorough repair and working condition' the jointly leased premises, 'and in supervising and managing the same * * *'.'
 
 Covenant 14 in pertinent part provides:
 
 13
 'And whereas, it may become necessary for the lessor to construct viaducts at street crossings on the portions of the main line herein leased, and to make improvements or betterments and acquire additional property for the common use of all the tenant companies of the lessor, the lessee hereby agrees, that in such event it will provide and pay one-sixth of the cost thereof.'
 
 
 14
 Western Indiana on brief here makes the following statement which clearly delineates the issue for decision:
 
 
 15
 'The single issue presented by this appeal is whether the sum of $122,247.87 expended by Western Indiana in rebuilding or restoring its extensively destroyed interlocking tower, and the machines located therein, should be paid for by Santa Fe under the provisions of Covenant FIFTH of the covenants of the lessee contained in the 1887 Lease, or Covenant FOURTEENTH of the covenants of the lessee contained in said lease. Covenant FIFTH is that governing expenses incurred or paid by Western Indiana in 'maintaining and keeping in thorough repair and working condition the main track or tracks, passenger depot, terminal facilities, and other property' covered by the lease. Covenant FOURTEENTH governs the making of improvements or betterments to the leased property and the acquisition of additional property for use in common. Under covenant FIFTH, Santa Fe would owe to Western Indiana 46.103% Of the expenditure; under Covenant FOURTEENTH, Santa Fe would owe 16.67%.'
 
 
 16
 Thus, the issue is whether the expenses incurred by Western Indiana in the construction of a new tower building and interlocker were for 'maintenance and repair' under Covenant 5, or for 'improvements or betterments' under Covenant 14.
 
 
 17
 Western Indiana devotes much of its argument to a consideration of numerous other covenants in the lease, presumably to demonstrate what was intended by Covenants 5 and 14. For instance, in its brief it states:
 
 
 18
 'Throughout the instrument, the words 'maintain', 'repair', 'rebuilding', 'restoration', and 'renewal' are painstakingly segregated from the words 'improvements', 'betterments', 'additions', 'additional property', and 'improvements of existing property'. The first group are the words descriptive of expenditures made by Western Indiana toward which Santa Fe owes a wheelage, or user, proportion under its FIFTH covenant. The second group encompasses expenditures of the type towards which Santa Fe contributes one-sixth of the cost under its FOURTEENTH covenant.'
 
 Western Indiana further states:
 
 19
 'The separation of the two concepts is complete. Restorations, rebuildings, renewals, replacements or extensive maintenance of existing assets are merely routine maintenance expenses under the lease, and Santa Fe is obligated to pay to Western Indiana a user proportion of such expenses under its FIFTH covenant.'
 
 
 20
 In support of the distinction thus made, Western Indiana cites 'by way of example' Covenant 3, by which it 'undertakes to keep and maintain in thorough repair, working order and condition the subject property, using the best and most suitable materials for renewal of the same as renewal shall, from time-to-time, become necessary.' It is not discernible how Covenant 3 furnishes any support for the interpretation which Western Indiana would have us give to Covenant 5, as Covenant 5 does not mention restoration, rebuilding, renewal or replacement; it provides only for expenses incurred in maintenance and repair.
 
 
 21
 We do not doubt Western Indiana's assertion that the lease involved was the work of skilled draftsmen who understood the use of words. We also have no reason to think that the meaning of such common words as maintain, repair, renewal and restore has changed over the years. If they had intended Covenant 5 to include something other than maintenance and repair, they could easily have so provided. By the same reasoning, if they had intended to exclude such expenses from Covenant 14, they could likewise have so provided.
 
 
 22
 The tower building which was destroyed was built in 1952, and the interlocking machines were installed in 1926 and 1953. The new interlocking machines were the modern all-relay machines. Thus, the facilities destroyed were not maintained or repaired, they were replaced with new and different facilities. Common understanding of 'maintaining' and 'repairing' pre-supposes the continued existence of the object or facility in question. Here, the facilities destroyed ceased to exist functionally after the derailment.
 
 The district court concluded:
 
 23
 'The switching tower and interlocker system were 'additions or betterments' within the meaning of Santa Fe's Covenant Fourteenth of the lease and, accordingly, the applicable provisions of the lease required Santa Fe to pay 16.67% Of the amount expended.'
 
 
 24
 Santa Fe presented certain extrinsic evidence designed to show that Western Indiana had placed a construction upon Covenants 5 and 14 contrary to that which it sought to maintain in court. We need not cite authorities for the well recognized rule that such evidence is proper to consider in the construction of a contract, in the event of ambiguity or uncertainty. We think it unnecessary to enter into a detailed discussion of this evidence. It is sufficient to note that the court made findings relative thereto which are supported by the record. The court found:
 
 
 25
 '(7) That extensive portions of the Twelfth Street Interlocker were destroyed as a result of said derailment.
 
 
 26
 (8) That the plaintiff's Vice-President and General Manager asked plaintiff's Board of Directors to approve an expenditure of $119,900.00 as additions and betterments for building a new Interlocker.
 
 
 27
 (9) That plaintiff's Board of Directors approved the requested expenditure to restore the damaged Interlocker.
 
 
 28
 (10) The destroyed portions of the Interlocker were newly constructed at an actual cost of $122,247.87.
 
 
 29
 (11) That plaintiff's Valuation Engineer, under oath in an exhibit attached to plaintiff's Answers to Interrogatories, listed said expenditure as 'Additions'.'
 
 
 30
 We agree that the district court properly allowed Santa Fe's motion for a partial summary judgment on this phase of the case.
 
 
 31
 We now consider Santa Fe's appeal (No. 17376) which involves the following causes of action resulting from the derailment: (1) ultimate responsibility between the parties for the sum of $75,000 paid by Western Indiana in settlement of the judgment of Leo V. Harrison against it for his personal injuries; (2) Santa Fe's claim against Western Indiana for the damages sustained by Santa Fe equipment, and (3) Santa Fe's claim for expenditures made in disposing of passenger claims.
 
 
 32
 Western Indiana on brief appears to make a fair statement of the issue for decision:
 
 
 33
 'Specifically, the question for determination is whether covenant Fifth, or in the alternative, covenant Sixth, of the Lessee's (Santa Fe's) covenants as contained in that Lease is applicable to the causes of action. Ultimately, this requires a determination of whether Pete Sherrard was engaged in the supervision and management and joint use of the demised property under covenant Fifth, or whether he was serving Santa Fe in the operation of the demised property under covenant Sixth.'
 
 
 34
 Western Indiana relies exclusively upon the final provision of Covenant 6, which states:
 
 
 35
 '* * * the officers, agents and employees of the lessor, in respect to all questions of its liability for their negligence or misconduct, while serving said lessee * * * in the operation of any of the property hereby demised, shall be deemed to be in the service of the lessee.'
 
 
 36
 Santa Fe relies upon Covenant 5, which in pertinent part provides:
 
 
 37
 '(The lessees) * * * shall and will pay to the lessor their proportion of the expenses incurred or paid by the lessor * * * in supervising the use and managing the same (Dearborn Station), including all sums of money that the lessor shall pay or become liable for by reason of the said lessor being the agency of said management and supervision, and also including that resulting from the negligence of any of the agents or employees employed in connection with said supervision and management and joint use * * *.'
 
 
 38
 The district court in denying Santa Fe's motion for summary judgment decided that Covenant 5 was not applicable but that the rights of the parties were to be determined by Covenant 6. This decision was based on the court's conclusion that the negligence of Western Indiana was that of Santa Fe, which constituted a bar to the latter's right to recover on its counterclaim. For the same reason, it entered judgment for $75,000 in favor of Western Indiana as indemnification for the amount it had paid in settlement of Harrison's claim.
 
 
 39
 Inasmuch as the district court entered summary judgment in favor of Western Indiana, we suppose the narrow issue here is whether there was any genuine issue of fact which remained unresolved. Santa Fe argues that there was no proof that Sherrard, admittedly an employee of Western Indiana whose negligence caused the derailment, was serving Santa Fe at the time the train was derailed. The conclusion that Sherrard was so engaged rests solely upon the allegations contained in Western Indiana's pleadings. That proof was essential in support of the allegation was recognized by Western Indiana in its brief filed in the district court, in which it stated, 'Of course, the ultimate question of whether Pete Sherrard was so serving Defendant (Santa Fe) is at issue and still unresolved.' Western Indiana in the same brief stated, 'As previously indicated, this issue is as yet unresolved. * * * If Plaintiff is unable to prove its allegations that Pete Sherrard was serving Defendant within the meaning and intent of covenant Sixth, then, and only then, would covenant Fifth be properly applicable.' There was no such proof, and we conclude that summary judgment in favor of Western Indiana was improper.
 
 
 40
 Even so, the issue as to the capacity in which Sherrard acted is encompassed in the broader issue as to whether the liability of Santa Fe should be determined under Covenant 5 or Covenant 6. It was in that framework that the case was presented to the district court, as it is here, and we think we should decide it on that basis.
 
 
 41
 The district court made rather extensive findings, upon which it predicated its conclusion that Covenant 6, not Covenant 5, was controlling. No complaint is made by either party as to the findings, and we assume they correctly reflect the rights and obligations of the parties under the lease.
 
 The court found:
 
 42
 '4. Plaintiff, Western Indiana, owns and operates a multiple track terminal railroad extending into the City of Chicago, Illinois, including a passenger terminal facility fronting on the south side of Polk Street in said City, and extending from Clark Street on the west to State Street on the east, the principal structure of said facility being known as Dearborn Station. * * *
 
 
 43
 '6. Defendant, Santa Fe, * * * uses the facilities of said Dearborn Station, including a portion of the plaintiff Western Indiana's main tracks, which furnish an approach thereto and departure therefrom for the defendant Santa Fe's Chicago passenger train traffic. Such use is made by the defendant in common with that of a similar nature which is made of said tracks and facilities by said plaintiff and its said five (5) owner railroads above named.
 
 
 44
 '8. For the privilege of thus conducting its passenger train traffic on the premises leased from the plaintiff Santa Fe pays to said plaintiff a stated annual rental, plus one-sixth (1/6th) of the cost of improvements, i.e., additions and betterments to the leased premises, and a share, based on its wheelage use, of operating expenses * * *.
 
 
 45
 '10. Santa Fe conducts all of its passenger train operations over the tracks owned by plaintiff included in the scope of said leases, with its own forces and equipment. It operates its own locomotives and cars in all its train and switching movements, which locomotives are manned by Santa Fe's own engine crews in company with its trainmen and switching crews. All such Santa Fe operations are performed under the general control, management and supervision of the Western Indiana, in accordance with the provisions of the Lease of May 21, 1887.
 
 
 46
 '11. In order for Western Indiana to comply with the provisions of said Lease of 1887, it is required to supply laboring and supervisory forces adequate to meet the needs of the Santa Fe in the performance of its operations over and upon the leased premises including in the vicinity of the approaches to Dearborn Station at 12th Street, yardmasters and switchtenders to supervise, control and operate the tracks and track function for train and switching movements to and from the passenger station area and to operate many of the track switches used in connection with such train and switching movements. Such persons perform a similar function for the train movements of the five (5) owner railroads of Western Indiana and for Western Indiana's own train and switching movements.
 
 
 47
 '13. On September 1, 1963, one Pete Sherrard, a Western Indiana employee, was working as switchtender in the vicinity of 12th Street Tower. His duties involved the operation of the manually operated switches contained within plaintiff's 12th Street interlocking system in accordance with the instruction given him by the Yardmaster. While so employed and while Santa Fe Train No. 19 was outbound departing from Dearborn Station upon track No. 3, the said Pete Sherrard negligently and carelessly threw the operating lever of the crossover switch when the rear portion of said Train No. 19 was passing over the same, derailing the rear two cars contained in said train.'
 
 
 48
 In summary, these findings clearly reveal that Santa Fe under the terms of the lease acquired nothing more than the privilege of operating its trains with its own labor force over the tracks which, together with other facilities, were under the control, management and supervision of Western Indiana. Furthermore, so that Santa Fe might exercise such privilege, Western Indiana was obligated to supply the labor and supervisory forces, including yardmasters and switchtenders, necessary to control and operate the tracks for Santa Fe's train and switching movements. Western Indiana was required to perform a similar function for five other railroads and for its own train and switching movements.
 
 
 49
 In our view, the terms of the lease as revealed by these findings completely dispel any basis for the conclusion that Sherrard was an employee of Santa Fe or that he was serving Santa Fe when he negligently threw a switch beneath the latter's departing train. Santa Fe had no obligation and was without authority to conduct the switching operation. That was solely the obligation of Western Indiana. Such being the case, it is not discernible on what basis it can be concluded either as a matter of fact or of law that Sherrard at the time he performed his negligent act was an employe of Santa Fe or engaged in its service. In the movement of its train Santa Fe was properly exercising its privilege to use the tracks and had no reason to anticipate that such privilege would be interfered with by the negligent conduct of an employe of Western Indiana.
 
 
 50
 Western Indiana on brief here describes the situation where the derailment took place thus, 'This is the 'nerve center' of the interlocking plant serving the myriad of tracks entering Taylor Street Yard.' At another point it admits that it controls the switching function and operation, and that 'It does so as a practical matter to obviate the intolerable situation which would be brought about if six railroads themselves all sought to operate the switches.' We might add that Western Indiana does this not only as a practical matter but also because of its obligation under the lease.
 
 
 51
 Western Indiana in its brief in the district court stated:
 
 
 52
 'Plaintiff freely concedes, and in fact would insist, that it had at all times pertinent, the general control, management, supervision and direction of the leased premises, including the use made of the same by Defendant. Additionally, Plaintiff concedes that when it is acting in this capacity, it can incur liabilities and obligations which would be covered by the provisions of covenant Fifth of Lessee's covenants (those with respect to which Defendant should bear a proportion measured by use). However, the lease also contains another covenant (6) which contemplates that Plaintiff does not always act in such general capacity.'
 
 
 53
 After quoting the pertinent provision of Covenant 6, its brief stated:
 
 
 54
 'The foregoing obviously indicates that it was in the contemplation of the parties to the agreement that employees of the Plaintiff would, at times, be specifically serving the Defendant as contrasted with the fact that at other times they would be contemporaneously serving all railroad tenants in a general capacity. This provision would be drained of all meaning if Plaintiff's employees were held to always act in a general capacity in behalf of all railroad tenants.'
 
 
 55
 Perhaps before concluding we should make reference to two covenants of the lease strongly relied upon by Western Indiana in support of its contention that Sherrard was assisting Santa Fe in the operation of its train. The pertinent part of Covenant 10 as set forth in its brief is:
 
 
 56
 '* * * the lessor shall have the general control, management and supervision of the tracks, sidings, branches, depot, depot grounds, and all other property of the lessor, which may be used by * * * (Santa Fe) * * * in conjunction with others, and the full and sole control and direction of the management, use, location, improvement and repair of the same, and the appointment and supervision of all officers, agents and employees necessary for such purposes. And any of such agents and employees assisting in the operation thereof shall be changed on demand of the lessee * * *.'
 
 
 57
 The pertinent portion of Covenant 1, also set forth in Western Indiana's brief, is:
 
 
 58
 'The lessor shall have the general control and management and supervision of the * * * property which may be used by (Santa Fe) in conjunction with others, and the full and sole control and direction of the management, use, location, improvement and repair of the same; the appointment and supervision of all officers, agents and employes necessary for such purposes * * *.'
 
 
 59
 We think there is nothing in these covenants which furnishes support to Western Indiana's position. Both relate to the rights, duties and obligations of Western Indiana, except Covenant 10 confers upon Santa Fe the right to demand a change of employees 'assisting in the operation thereof,' which evidently refers to an operation by Western Indiana.
 
 
 60
 It is our judgment and we so hold that Sherrard at the time he negligently operated the switch was not serving Santa Fe. He was an employe of and serving Western Indiana, which was charged with the obligation of operating the facilities so that Santa Fe might exercise the privilege granted to it by the lease. Consequently, Santa Fe is not liable under Covenant 6. This conclusion does not mean that Covenant 6 is 'drained of all meaning,' as asserted by Western Indiana. It means only that it is not applicable under the facts of this case.
 
 
 61
 From the conclusion reached, it follows that Santa Fe, as provided in Covenant 5, is liable for its proportion of expenses, including those which Western Indiana paid or became liable for 'resulting from the negligence of any of the agents or employees employed in connection with said supervision and management and joint use * * *.'
 
 
 62
 The judgment in appeal No. 17377 is affirmed. The judgment in appeal No. 17376 is reversed and the cause remanded, with directions that Santa Fe's liability be calculated in accordance with the formula provided in Covenant 5.
 
 
 63
 FAIRCHILD, Circuit Judge (concurring in part, dissenting in part).
 
 
 64
 I agree with the disposition of appeal No. 17376. With respect to appeal No. 17377, however, it seems to me that replacement of the switching tower was maintenance and its cost should be allocated under covenant 5. Particularly in a 999 year lease where it must be assumed that replacements several times over will be needed to maintain the leased premises, the necessary replacement (with substantially similar substance) of portions of the premises which either existed in 1887 or were later added as improvements should be treated as maintenance. The use of the term 'additions and betterments' to describe the replacement does not conclusively establish that Western Indiana was making an improvement rather than providing maintenance.
 
 
 
 [1]
 The court reasoned that Covenant 6 did not 'provide for any liability on the part of the defendant in a suit initiated by the plaintiff.'